Michael A. Callinan (MC7052)
Vanessa H. Hlinka (VH0808)
Jennifer B. Strong (JS1420)
Matthew J. Smith (MS4408)
**CALLINAN & SMITH LLP**
3361 Park Avenue, Suite 104
Wantagh, New York 11793
(516) 784-5148

*Counsel for Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X

LIBERTY MUTUAL INSURANCE COMPANY, LIBERTY MUTUAL FIRE INSURANCE COMPANY, LIBERTY INSURANCE CORPORATION, THE FIRST LIBERTY INSURANCE CORPORATION, LM INSURANCE CORPORATION, LIBERTY MUTUAL MID-ATLANTIC INSURANCE COMPANY, LIBERTY COUNTY MUTUAL INSURANCE COMPANY, LM PROPERTY and CASUALTY INSURANCE COMPANY, LM GENERAL INSURANCE COMPANY, WAUSAU UNDERWRITERS INSURANCE COMPANY, SAFECO INSURANCE COMPANY OF INDIANA, AMERICAN STATES INSURANCE COMPANY and MONTGOMERY MUTUAL INSURANCE COMPANY,

Docket No.:

**CIVIL COMPLAINT**

**Plaintiffs Demand a Trial by Jury**

Plaintiffs,

-against-

AVK RX INC, KRISTINA'S PHARMACY INC. a/k/a KRISTINA S. PHARMACY INC. d/b/a ESSENTIAL RX, IDEAL CARE PHARMACY, INC. d/b/a IDEAL CARE PHARMACY, LEON NAISHULER, OLGA BRUK, GREGORY ABRAMOV, DAVID MANNING, IRINA ARONOVA, ALEXANDER BALDONADO, M.D., HONG SIK PAK, M.D., PAULA BROWN, M.D., PHYLLIS GELB, M.D., AUGUSTUS

- 1 -

IGBOKWE, P.A., IGOR ZILBERMAN, M.D., and John Doe(s) 1-10.

Defendants.

----------------------------------------------------------------------X

## CIVIL COMPLAINT

Plaintiffs, Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company (hereinafter collectively referred to as "Liberty Mutual" or "Plaintiffs"), by and through their attorneys, Callinan & Smith LLP, as and for their complaint against the Defendants in this action, hereby allege as follows upon information and belief:

## PRELIMINARY STATEMENT

1.      This action seeks to recover more than One Hundred and Seventy Thousand Dollars ($170,000.00) that Defendants, AVK Rx Inc ("AVK"), Kristina's Pharmacy Inc. a/k/a Kristina S. Pharmacy Inc. d/b/a Essential Rx ("Essential"), and Ideal Care Pharmacy, Inc. d/b/a Ideal Care Pharmacy ("Ideal") have wrongfully obtained from Liberty Mutual by submitting, or causing to be submitted, fraudulent No-Fault insurance charges for unnecessary pharmaceutical services, namely prescriptions for various medications and compounded  medications (collectively, the "Fraudulent Pharmaceuticals"), that Defendants allegedly rendered on referrals from various No-Fault medical clinics to individuals ("Insureds") who were involved in automobile accidents and eligible for insurance coverage under the Plaintiffs' insurance policies. **Liberty Mutual's investigation into this matter revealed a vast conspiracy that involves the stolen credentials**

of at least one physician (Arkam Rehman, M.D.) in order to generate the fraudulent prescriptions at issue in this litigation.  A copy of the Affidavit of Dr. Rehman attesting to the fraudulent and illegal use of his medical license and credentials in order to generate "prescriptions" that were filled by AVK, Essential and Ideal is attached hereto as Exhibit "1".

2.     This action further seeks a declaration that Liberty Mutual is not legally obligated to pay reimbursement of approximately Nine Hundred Forty-Five Thousand Dollars ($945,000.00) in pending charges submitted by or on behalf of Defendants AVK, Essential and Ideal because:

 i)    many of the Fraudulent Pharmaceuticals provided by AVK, Essential and Ideal were not provided pursuant to lawful prescriptions completed by duly licensed medical practitioners;

 ii)   the Fraudulent Pharmaceuticals were not medically necessary and were provided, to the extent that they were provided at all, pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

 iii)  the Fraudulent Pharmaceuticals were provided, to the extent that they were provided at all, pursuant to illegal kickback arrangements between the Defendants and others;

 iv)   the Fraudulent Pharmaceuticals provided, to the extent they were provided at all, were ordered pursuant to a fraudulent billing and treatment protocol created and controlled by unlicensed laypersons;

 v)    Defendant AVK is not entitled to receive No-Fault reimbursements for healthcare services allegedly rendered as AVK failed to meet a material condition precedent to coverage as set forth in the applicable policy of insurance as well as the No-Fault Regulation by refusing and failing to appear for a duly scheduled Examination Under Oath ("EUO"); and

vi)   Defendant Ideal lacks standing to seek or receive No-Fault reimbursements for any bill submitted for which verification was requested and for which the Defendant failed provide.

3.      The Defendants fall into the following categories:

i)    Defendants, AVK, Essential and Ideal (hereinafter referred to as the "Pharmacy Defendants"), are pharmacy corporations that allegedly provided the Fraudulent Pharmaceuticals and billed Liberty Mutual for those Fraudulent Pharmaceuticals;

ii)   Defendant Gregory Abramov ("Abramov") is purportedly the nominal owner of Essential; Irina Y. Aronova ("Aronova") is the purported nominal owner of AVK and is allegedly the pharmacist at AVK; and Leon Naishuler ("Naishuler") is the purported nominal owner of Ideal (collectively, "Pharmacy Owner Defendants");

iii)  Defendant Olga Bruk ("Bruk") is purportedly the pharmacist associated with Ideal; David Manning is purportedly the pharmacist associated with Essential; and Aronova is purportedly the pharmacist associated with AVK; (collectively, the "Pharmacists Defendants'); and

iv)   Defendants Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., Igor Zilberman, M.D. (collectively referred to as "Referring Providers") are physicians and other medical professionals who purportedly made referrals to the Pharmacy Defendants and who have been financially enriched by their participation in the scheme which seeks compensation for Fraudulent Pharmaceuticals.

4.      The Pharmacy Defendants are not and have never been eligible to be compensated for the Fraudulent Pharmaceuticals  because, at all relevant times, they knew: (i) the Fraudulent Pharmaceuticals were not medically necessary and were provided, to the extent that they were provided at all, pursuant to a pre-determined fraudulent protocol designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; (ii) the Fraudulent Pharmaceuticals were provided, to the extent that they were

provided at all, pursuant to illegal kickback arrangements between the Defendants and others; (iii) the Fraudulent Pharmaceuticals provided, to the extent they were provided at all, were ordered pursuant to a fraudulent billing and treatment protocol created and controlled by unlicensed laypersons; (iv) that many of the Fraudulent Pharmaceuticals provided were not provided pursuant to lawful prescriptions completed by duly licensed medical practitioners; (v) that AVK failed to meet a material condition precedent to coverage as set forth in the applicable policy of insurance as well as the No-Fault Regulation by refusing and failing to appear for a duly scheduled Examination Under Oath ("EUO"); and (vi) that Ideal lacks standing to seek or receive No-Fault reimbursements for any bill submitted for which Ideal was requested to provide pertinent information the Plaintiff deems necessary to evaluate the claim as a mandatory condition precedent to coverage

5.      The charts annexed hereto as **Exhibits "2"** through **"4"** respectively set forth the fraudulent claims that have been identified to date that the Pharmacy Defendants, AVK, Essential, and Ideal, submitted, or caused to be submitted, to Liberty Mutual.  A chart detailing by claim number, the receipt of Defendants' bills, the issuance of verification requests, the scheduling of the EUO and the timely denial of the claim is attached hereto as **Exhibits "5"** (AVK), for AVK's failure to appear for an EUO.  A chart detailing by claim number, the receipt of Defendants' bills, the issuance of verification requests scheduling of the EUO of Ideal and the subsequent issuance of verification requests for additional information that was never submitted, and the timely denial of the claim is attached hereto as **Exhibits "6"** (Ideal), for Ideal's failure to provide additional verification and cooperate with the Plaintiffs' investigation.

6.      Defendants' conduct, including the submission of fraudulent claims using the Taxpayer Identification Numbers ("TINs") of AVK, Ideal, and Essential, which were submitted

through the United States Postal Service seeking reimbursement pursuant to the New York No-Fault Regulation, represents violation of the federal Racketeer Influenced and Corrupt Organizations (RICO) statute.

7.    The Defendants' fraudulent scheme began as early as June 2019 and has continued uninterrupted through present day.

8.    As a result of the Defendants' fraudulent scheme, Liberty Mutual has incurred actual and potential damages of more than Nine Hundred Forty-Five Thousand Dollars ($945,000.00).

## THE PARTIES

### I.    Plaintiff

9.    Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company and any and all of their subsidiaries, affiliates and/or parent companies (hereinafter collectively referred to as "Liberty Mutual") are insurance companies duly authorized to issue automobile polices in the State of New York.  Liberty Mutual maintains a place of business in Uniondale, New York.

### II.    Defendants

10.    Upon information and belief, AVK was and is a domestic business corporation with principal place of business in New York.   AVK was incorporated in New York on or about May 20, 2016.  AVK is purported to be owned and supervised by Aronova. AVK, through Aronova,

"filled" fraudulent prescriptions utilizing the stolen credentials of Dr. Rehman and was used by the unlicensed laypersons as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

11.     Defendant Aronova resides in and is a citizen of New York.  Aronova is believed to have directed the medical provider defendants as to the creation and execution of the scheme, including instructing the Referring Providers to pre-execute prescriptions could be later issued without additional authorization.

12.     Upon information and belief, Ideal was and is a domestic business corporation with principal place of business in New York.   Ideal was incorporated in New York on or about August 14, 2012.  Ideal Care is purported to be supervised by pharmacist, Olga Bruk.  Ideal purportedly is owned by Leon Naishuler.  Ideal, through Bruk, "filled" fraudulent prescriptions utilizing the stolen credentials of Dr. Rehman and was used by the unlicensed laypersons as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

13.     Defendant Naishuler resides in and is a citizen of New York.  Naishuler is believed to have directed the medical provider defendants as to the creation and execution of the scheme, including instructing the Referring Provider to pre-execute prescriptions which could be later issued without additional authorization.

14.     Defendant Bruk resides in and is a citizen of New York.  Bruk is the pharmacist for Ideal and is the individual responsible for dispensing the Fraudulent Pharmaceuticals.  Bruk was an indispensable part of the fraud perpetrated as it is through their license that Ideal was able to dispense the Fraudulent Pharmaceuticals.

15.     Upon information and belief, Essential was and is a domestic business corporation with principal place of business in New York.   Essential was incorporated in New York on or

about July 28, 2015.  Essential is purported to be supervised by pharmacist, David Manning. Essential purportedly is owned by Abramov.  Essential, through Manning, "filled" fraudulent prescriptions utilizing the stolen credentials of Dr. Rehman and was used by the unlicensed laypersons as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers.

16.     Defendant Abramov resides in and is a citizen of New York.  Abramov is believed to have directed the medical provider defendants as to the creation and execution of the scheme, including instructing the medical providers pre-execute prescriptions from the associated Referring Physicians which could be later issued without further authorization.

17.     Defendant Manning resides in and is a citizen of New York.  Manning is the pharmacist for Essential and is the individual responsible for dispensing the Fraudulent Pharmaceuticals.  Manning was an indispensable part of the fraud perpetrated as it is through their license that Essential was able to dispense the Fraudulent Pharmaceuticals.

18.     Defendant Alexander Baldonado, M.D., resides in and is a citizen of New York. Baldonado was licensed to practice medicine in New York on July 11, 2013.  Baldonado has permitted his name and license to be used as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers through referrals to the Pharmacy Defendants.  In May 2021, Defendant Alexander Baldonado was indicted on federal charges consisting of six counts of health care fraud on charges related to a COVID-19 health care fraud scheme.

19.     Defendant Hong Sik Pak, M.D., resides in and is a citizen of New Jersey. Pak was licensed to practice medicine in New York on July 9, 2018.  Hong has permitted his name and license to be used as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers through referrals to the Pharmacy Defendants.  Pak has a history of professional misconduct which resulted in discipline from the New Jersey and Pennsylvania Medical boards.

20.     Defendant Paula Brown, M.D., resides in and is a citizen of New York and was licensed to practice medicine in the State of New York on February 24, 2006.  Brown has permitted her name and license to be used as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers through referrals to the Pharmacy Defendants.

21.     Defendant Phyllis Gelb, M.D., resides in and is a citizen of New York and was licensed to practice medicine in New York on February 23, 1996.  Gelb has permitted her name and license to be used as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers through referrals to the Pharmacy Defendants.

22.     Defendant, Augustus Igbokwe resides in and is a citizen of the State of New York and was licensed as a physician assistant in New York on July 29, 2014.  Igbokwe has permitted his name and license to be used as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers

23.     Defendant Igor Zilberman, M.D., resides in and is a citizen of the State of New York and was licensed to practice Medicine in New York on February 1, 2006.  Zilberman has permitted his name and license to be used as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers through referrals to the Pharmacy Defendants.

## **VENUE**

24.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under 18 U.S.C. § 1961 *et seq.* (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367 and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

25.     Pursuant to 28 U.S.C. § 1332(a)(1), this Court also has jurisdiction over this action because Plaintiffs and Defendants are citizens of different States; no Plaintiff is a citizen of the same state as any Defendant; and the amount in controversy exceeds $75,000.00.

26.     Venue in the Eastern District is appropriate pursuant to 28 U.S.C. § 1391(b), as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## **ALLEGATIONS COMMON TO ALL CLAIMS**

**I.     An Overview of the No-Fault Laws and Licensing Requirements**

27.     Liberty Mutual underwrites automobile insurance in the State of New York.

28.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Reparations Act (N.Y. Ins. Law Section 5101, *et seq.*) and the No-Fault Regulation (11 NYCRR 65, *et seq.*) automobile insurers are required to provide personal injury protection benefits ("No-Fault Benefits") to their insureds.

29.     The No-Fault Laws limit reimbursement for benefits to prescription drugs only. Over-the-counter ("OTC") drugs and products which may be purchased without a prescription are not covered expenses under the No-Fault Laws.

30.     No-Fault benefits include up to $50,000.00 per insured for necessary expenses that are incurred for healthcare goods and services.  An insured can assign his/her rights to the provider(s) of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered by submitting the claim form required by the

New York State Department of Insurance, commonly referred to as an "NF-3". In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

31.    Pursuant to the No-Fault Regulation, only healthcare providers in possession of a direct assignment of benefits are entitled to bill and collect No-Fault benefits. There is both a statutory and regulatory prohibition against payment(s) of No-Fault benefits to anyone other than the patient or his or her healthcare provider.

32.    Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

33.    The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local dispensing requirement necessary to perform such service in New York … (emphasis supplied).

34.    In *State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d 313 (2005), the New York Court of Appeals made clear that healthcare providers who fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially valid license to determine whether there was a failure to abide by state and local law.

35.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to Liberty Mutual, and to all other automobile insurers, must be verified by the healthcare provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance

company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     An Overview of Applicable Licensing Requirements

36.     Pursuant to New York Education Law § 6808, no person, firm, corporation, or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

37.     Pursuant to 8 N.Y.C.R.R. § 29.1, pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

38.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

39.     Pursuant to 8 N.Y.C.R.R. § 63.1(7), pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

40.     New York Education Law § 6530(38) prohibits a licensed physician from entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of code or specially marked prescriptions, while New York Education Law § 6811 makes it a crime for any person to enter into an agreement with a physician (or other licensed healthcare provider) for the compounding or dispensing of secret formula ("coded") prescriptions.

41.     New York Education Law § 6810 prohibits pharmacies from dispensing pharmaceuticals when a prescription form for a drug includes any other drug. Separate prescriptions are required for each drug prescribed and dispensed.

42.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

43.     Pursuant to New York Education Law § 6512, §6530(11), (18), and (19), aiding and abetting an unlicensed person to practice a profession, offering any fee or consideration to a third party for the referral of a patient, and permitting any person not authorized to practice medicine to share in the fees for professional services is considered a crime and/or professional misconduct.

44.     New York Education Law § 6530 (17) prohibits a licensed physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

45.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

46.     New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of a fee in connection with professional care or services related to drugs and/or medications.

47.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

48.     Furthermore, physician assistants are also controlled in their prescription writing under 10 NYCRR 94.2 (e) et seq. Specifically, 10 NYCRR 94.2(e)(1) reads as follows:

> A licensed physician assistant may issue prescriptions for a patient who is under the care of the physician responsible for the supervision of the licensed physician assistant. The prescription shall be issued in accordance with Section 281 and Article 33 of the Public Health Law and Part 80 of this Title, written on the blank form of the supervising physician and shall include the name, address and telephone number of the supervising physician and the name of the licensed physician assistant. The prescription shall also bear the name, the address, the age of the patient and the date on which the prescription was issued.

## III.    An Overview of Drug Products

49.     The United States Federal Food, Drugs, and Cosmetic Act ("FDCA") authorizes the FDA to oversee the safety of food, drugs, and cosmetics.

50.     The FDA strictly regulates OTC and prescription drugs, and oversees drug manufacturing in several ways, including testing drugs and routinely inspecting drug manufacturing plants and outsourcing facilities engaged in the compounding of drugs.

51.     FDA-approved drugs require: (i) approval prior to marketing; (ii) compliance with federal labelling laws; and (ii) that the drugs be made and tested in accordance with good manufacturing practice regulations (GMPs), which are federal statutes that govern the production and testing of pharmaceutical products.

IV.     **Historical Background and The Defendants' Current Fraudulent Scheme**

52.     Beginning in as early as June 2019 and continuing through the present, a fraudulent scheme has existed, which entails the submission of inflated charges for medically unnecessary healthcare services rendered pursuant to a pre-determined fraudulent treatment protocol, seeking reimbursement from No-Fault insurance carriers such as Liberty Mutual, which they were not eligible to receive – for the Fraudulent Pharmaceuticals, including the Fraudulent Pain Creams and the Fraudulent Topical Pain Products purportedly dispensed to Insureds.

53.     AVK, Essential and Ideal all continue to perpetrate their fraudulent activities through the ongoing submission of billing to Liberty Mutual and/or by hiring law firms to pursue collection on the voluminous billing submitted to Liberty Mutual and other No-Fault insurance carriers.

54.     The Pharmacy Defendants were presented as separate, storefront neighborhood pharmacies operating in the metropolitan New York area, when in fact, they essentially operated as a single, large-scale fraudulent scheme, that exploited Liberty Mutual's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally disregarding a vast array of other pharmaceutical products, including other OTC medications readily available at a fraction of the cost.

55.     Each of the Pharmacy Defendants used the same law firm to submit its billing to Liberty Mutual, each used similar billing forms, and each billed for substantially the same pharmaceuticals. In some instances, the order forms for the Fraudulent pharmaceuticals were identical as to the pre-printed information contained therein for various prescriptions.

56.     The Pharmacy Defendants operated, and continue to operate, as part of the same fraudulent scheme, notwithstanding the submission of fraudulent billing under three different

names and three different identification numbers, and the filing of numerous separate collection proceedings to collect the fraudulent billing on behalf of these three ostensibly separate pharmacies.

57.     The Pharmacy Defendants billing specifically targeted fraudulent topical pain products, which consisted of 5% lidocaine ointment and separate 5% lidocaine patches, 200 mg Celecoxib, Tizandine HCL 4 mg, Omperazole 20 MG, Ibuprofen 800 MG and Esgic 50-325-40, and Diclofenac Sodium 3% Gel.

58.     The Pharmacy Defendants have submitted over $900,000.00 in fraudulent billing to Liberty Mutual under the names of AVK, Essential, and Ideal.

59.     Upon information and belief, approximately 80% of the prescriptions received from Liberty Mutual from Essential were from referrals from one location, that being a 3027 Avenue V in Brooklyn, New York from the Referring Providers. **As detailed in the Affidavit of Dr. Rehman, his medical license and credentials were utilized by some unknown person or persons at 3027 Avenue V and 632 Utica Avenue as a means of generating numerous fraudulent and falsified prescriptions for the medications that are alleged to have been provided by the Pharmacy Defendants**.

60.     As discussed in greater detail *infra*, Liberty Mutual has learned that many prescriptions submitted to them from the address in the preceding paragraph were fraudulent, and at least one physician has provided detailed testimony and an affidavit outlining that various prescriptions, medical orders for durable medical equipment and orthotics, and referrals for treatment and diagnostic services, despite being attributed to him, were not executed by him or at his direction, and were fraudulently completed by third parties.

61.     Notably, the scheme was devised in a way that the Pharmacy Defendants, despite purportedly having no connection, would receive prescriptions from the various Referring Providers, usually out of one of two facilities, for the various Fraudulent Pharmaceuticals.

62.     In keeping with the fact that the Defendants targeted a specific and limited set of pharmaceuticals that enabled them to maximize their inflated charges to Liberty Mutual, as stated above, the Defendants, through AVK, Ideal and Essential, overwhelmingly dispensed and billed for 5% lidocaine ointment and separate 5% lidocaine patches, 200 mg Celecoxib, Tizandine HCL 4 mg, Omperazole 20 MG, Ibuprofen 800 MG and Esgic 50-325-40, and Diclofenac Sodium 3% Gel.

63.     The Pharmacy Defendants chose these topical pain products and oral medications, because they could acquire them at low cost and submit claims for reimbursement to Liberty Mutual at exorbitant prices after illegally steering the prescriptions to themselves.  Moreover, the Pharmacy Defendants knew that similar OTC drug products that could be recommended to insured were not covered expenses under the No-Fault law.

64.     In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with the Referring Providers in which the Defendants steered them to prescribe and direct large volumes of prescriptions to AVK, Ideal and Essential for the targeted set of Fraudulent Pharmaceuticals, including the Fraudulent Pain Creams and oral medications which were purportedly prescribed and dispensed to treat patients at the No-Fault Clinics.

65.     The Defendants ensured that the Referring Providers and facilities directed the prescriptions for the Fraudulent Pharmaceuticals to AVK, Ideal and Essential regardless of (i) the distance of the pharmacy to the Insureds' residences and (ii) the fact that there were countless other pharmacies located much closer to the Insured's residences.

66.     In fact, in one such instance, an Insured who resides in Brooklyn was initially directed to one of the Pharmacy Defendants located in Queens County, and then later referred to another facility located in Brooklyn, though given an entirely different combination of prescriptions despite coming from the same Referring Provider.

67.     In some instances, the Insureds' residences are located outside of New York City, with some residences located more than 60 miles away from the Pharmacy Defendants, including outside of the State of New York.

68.     But for the Defendants' illegal, collusive agreements with the Referring Providers and facilities, these Insureds would not have received pharmaceutical products from a pharmacy that is located in a county, city, or state outside of their place of residence.

69.     Instead, the Referring Providers and the facilities directed prescriptions for the Fraudulent Pharmaceuticals to the Pharmacy Defendants, irrespective of their inconvenient locations to the Insureds' residences because the prescriptions were being issued pursuant to illegal, collusive agreements between the Defendants and the Referring Providers and facilities.

70.     The Pharmacy Defendants, in exchange for the payment of kickbacks or other financial incentives, received medically unnecessary prescriptions from the Referring Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols.

71.     The No-Fault Clinics present themselves as legitimate healthcare practices when, in fact, they are one-stop-shop medical mills designed to subject Insureds to as many healthcare goods and services as possible in order to submit volumes of fraudulent claims to No-Fault insurers such as Liberty Mutual without regard to genuine patient care.

72.     The Pharmacy Defendants used the prescriptions obtained from the No-Fault Clinics to bill Liberty Mutual and other insurers for the Fraudulent Pharmaceuticals.

73.    The prescriptions and referrals sheets that the Pharmacy Defendants filled often contained preset labels or stamps with the names of some of the Fraudulent Pharmaceuticals, which the Defendants provided to the Referring Providers and facilities so as to make it as convenient as possible to prescribe, or cause to be prescribed, the Fraudulent Pharmaceuticals and steer those prescriptions to the Defendants.

74.    As previously detailed, the Referring Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

75.    **In fact, Dr. Arkham Rehman provided, in an affidavit to Liberty Mutual, a sworn statement that prescriptions made under his name and license to the Pharmacy Defendants were not authorized by him.**

76.    **He further affirmed that the prescriptions issued under his name and license were not legitimate, and that he disagreed with the medical necessity statements which generally accompanied the prescriptions.   In some cases, Dr. Rehman had no familiarity with or knowledge of the item that was prescribed to the Insured patient.**

77.    The Referring Providers and the facilities would have not engaged in the illegal, collusive arrangements with the Defendants in violation of New York law, including using the preset labels or stamps, intentionally prescribing the Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacy Defendants, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

**A.    The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care**

78.    In basic terms, the goal of medical treatment is to help patients get better in a timely manner.  Notwithstanding this basic goal, Insureds treated by the Referring Providers at No-Fault

Clinics associated with the facilities – and who received pharmaceuticals from the Pharmacy Defendants – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which lacks in individualized care and fails to utilize evidence-based medicine practices with the goal of the Insureds' timely return to good health.

79.     Despite the basic goal to help patients get better in a timely manner, the treatment reports almost uniformly reflect that the Insureds do not get better, do not return to good health, and/or do not experience improvement in their conditions such that the Insureds can terminate medical treatment expeditiously and return to normal activity.

80.     Rather, as part of the predetermined protocol, the referring medical practitioners produced generic, and boilerplate examination reports designed to justify continued, voluminous, and excessive healthcare services that the Referring Providers purport to render to Insureds. These healthcare services include prescribing excessive amounts of medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals.

81.     Notwithstanding the creation of the examination reports, the Referring Providers' prescription of the Fraudulent Pharmaceuticals dispensed by the Pharmacy Defendants was based on predetermined protocols designed to exploit the Insureds for financial gain, without regard to the genuine needs of the patients.  The sheer volume of very similar – and in many cases identical – prescription regimens given to persons who had allegedly been injured in different ways and with different injuries defies the specter of mere coincidence and is statistically impossible as stemming from a legitimate treatment regimen.

82.     To the extent any examination was actually performed at all, the Referring Providers failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals that were dispensed by the Pharmacy Defendants.

83.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety as the Referring Providers often did not know whether the patient was taking any medication or suffering from any co-morbidity that would contraindicate the use of a particular prescribed drug product.

84.     The Referring Providers also failed to document in their examination reports any superficial injuries thereby necessitating a prescription for a Fraudulent Topical Pain Product.

85.     The referring medical practitioners also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by the Pharmacy Defendants were actually used by the patient.

86.     The Referring Providers also failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals dispensed by the Pharmacy Defendants provided any relief to the patient or whether the patient experienced any side effects associated with the prescribed pharmaceutical products.

87.     At times, the Referring Providers failed to document in any of their examination reports that the patient was to receive a Fraudulent Pharmaceutical.

88.     Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., Ibuprofen and Diclofenac Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

89.     In keeping with the fact that the Fraudulent Pharmaceuticals were prescribed and dispensed without regard to genuine patient care, the Referring Providers issued multiple prescriptions for multiple Fraudulent Pharmaceuticals, from the same therapeutic class, on the same date to a single patient.

90.     One such facility from which the prescriptions for Fraudulent Pharmaceuticals emerged was Apex Medical, P.C. (hereinafter referred to as "Apex").  Apex, was and is a domestic professional corporation with principal place of business in New York.   Apex was incorporated in New York on or about July 25, 2019, and under the ownership of Dr. Arkham Rehman.

91.     The Apex name was used by the unlicensed laypersons as a vehicle to submit fraudulent billing to Liberty Mutual and other insurers through the referrals to the Pharmacy Defendants.

92.     Dr. Arkham Rehman is a physician licensed to practice medicine in New York and owned Apex Medical, P.C.   Unbeknownst to Dr. Rehman, third persons unknown to him used his name and license as part of a massive scheme to dispense medications, durable medical equipment, and tests and procedures which he had no knowledge of and did not permit and/or otherwise authorize.

93.     Dr. Rehman did not prescribe or authorize a prescription for drug screening, toxicology services, prescription medication, prescription creams, prescription gels, diagnostic testing for multiple patients who were also Liberty Mutual insureds or persons eligible for coverage under Liberty Mutual policies.

94.     The Fraudulent Pharmaceuticals appear to have been purportedly prescribed by Dr. Rehman at locations at either 3027 Avenue V, Brooklyn, New York, or from 632 Utica Avenue Brooklyn, New York.

95.     The Pharmacy Defendants that received prescriptions for the Fraudulent Pharmaceuticals included defendants AVK, Ideal, and Essential, amongst dozens of other healthcare providers for a variety of healthcare services.  **In fact, Dr. Rehman has specifically confirmed that the prescriptions filled by AVK, Ideal, and Essential and others are**

**fraudulent in nature and that he never prescribed or otherwise authorized the items to be dispensed**.

96.     An illustrative example of the prescriptions for Fraudulent Pharmaceuticals filled by the Pharmacy Defendants includes a prescription for Lidothol 4.5%, billed to the Plaintiffs at a cost of $2,626.20.  During a sworn statement, when asked about a prescription for Lidothol 4.5%, Dr. Rehman stated that he had no idea what the substance was, other than some sort of a local anesthetic.  When shown the actual prescription purportedly issued by him, Dr. Rehman added he did not recognize the prescription whatsoever.

97.      Not only are those such practices clearly part of a fraudulent scheme designed to maximize profit, but they also constitute therapeutic duplication and increase the risk of adverse drug reactions to the patients subject to them.

**V.     The Fraudulent Prescription Protocol**

98.     In accordance with the fraudulent scheme above, the Pharmacy Defendants routinely issued prescriptions for various topical pain creams.  The Pharmacy Defendants targeted and routinely billed Liberty Mutual for exorbitantly priced Fraudulent Topical Pain Products, primarily in the form of Diclofenac Gel 3% pursuant to duplicitous prescriptions solicited from the Referring Providers, in exchange for kickbacks or other financial incentives.

99.     The Pharmacy Defendants solicited the Referring Providers to provide them with voluminous prescriptions for Diclofenac Gel 3% because the Pharmacy Defendants could bill for this product at exorbitant prices, which egregiously inflated the charges submitted to Liberty Mutual and other New York No-Fault insurers.

100.    The FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating serious cardiovascular and gastrointestinal risks.

101. A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designated to call attention to serious or life-threatening risks associated with the drug or product.

102. Specifically, with every diclofenac sodium prescription, the FDA requires the patient to be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

103. Diclofenac sodium gel, when prescribed in 1% concentrations, is a topical NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet. It has not been proven effective for treating strains or sprains.

104. Diclofenac Gel 3%, i.e., the Diclofenac Gel prescribed by the Prescribing Providers and dispensed by the Defendants, is FDA approved to treat a skin condition known as actinic keratoses.

105. Diclofenac Gel 3% has no proven efficacy or safety in the treatment of musculoskeletal injuries, and the use of Diclofenac Gel 3% to treat musculoskeletal injuries represents an off-label use.

106. Notwithstanding the most common uses for Diclofenac Gel 3%, or the risks associated with the drug, the Pharmacy Defendants steered the Referring Providers to prescribe diclofenac sodium in the form of Diclofenac Gel 3%, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs – such as naproxen – and other Fraudulent Pharmaceuticals.

107. Prescribing Diclofenac Gel 3%, while simultaneously prescribing or

recommending the patient take oral NSAIDs is therapeutic duplication which results in increased risk with no additional therapeutic benefit.

108.    Nevertheless, the Referring Providers consciously prescribed and the Pharmacy Defendants consciously dispensed Diclofenac Gel 3%, in conjunction with oral NSAIDs and/or Fraudulent Pharmaceuticals to numerous Insureds, thereby engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being.

109.    Moreover, in keeping with the fact that Diclofenac Gel 3% was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Referring Providers virtually never stated the medical basis for the prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed diclofenac sodium.

110.    In fact, Dr. Rehman noted that even the instances where a letter of medical necessity letter was provided with the prescriptions, the letters of medical necessity were inaccurate and not rendered or supported by him.

111.    In further keeping with the fact that Diclofenac Gel 3% was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Referring Providers virtually never addressed whether the Diclofenac Gel 3% prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

112.    Further, the Referring Providers routinely failed to document prescriptions for the Diclofenac Gel 3%, which further indicates that there was no legitimate medical reason for the excessive amounts of Diclofenac Gel 3% dispensed by the Pharmacy Defendants, particularly

given the potential for adverse health effects to the Insureds.

113.    Not surprisingly, the Office of Inspector General of the U.S. Department of Health & Human Services issued a report which notes that one of the most common products billed for by pharmacies with questionable billing was diclofenac sodium.  In that same report, the OIG also noted that many pharmacies in New York State are among the most questionable in the nation. *See* Questioning Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-1600440 (August 2018).

114.    In addition to the egregious volume of Diclofenac Gel 3% dispensed by the Pharmacy Defendants in accordance with the fraudulent scheme discussed above, at times, the Pharmacy Defendants billed Liberty Mutual for exorbitantly priced topical Lidocaine 5% Ointment, pursuant to prescriptions solicited from the Referring Providers, in exchange for kickbacks or other financial incentives.

115.    The Liberty Mutual investigation determined that there was never any medical efficacy in the manner as to which these items were prescribed, no appropriate follow-up as to the patient's response to the prescriptions violating the applicable standard of care, and that the treatment pattern considered along with the prescriptions in question appeared to be a pre-determined fraudulent treatment protocol designed to inflate the revenues of the providers involved without concern for the actual patients' care.

116.    Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the body.  Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.  Notably, lidocaine does not penetrate the skin enough to

treat deep musculoskeletal pain.

117.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, confusion, dizziness, tremors, convulsions, respiratory depression, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest.  Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

118.    Despite this, the Referring Providers never recommended Insureds first use OTC Lidocaine products to treat minor aches and pains which they sustained in fender-bender type motor vehicle accidents.  Rather, pursuant to collusive arrangements and predetermined protocols, this was routinely prescribed to Insureds by the Referring Providers or caused the prescription of Lidocaine 5% Ointment and directed those prescriptions to the Pharmacy Defendants.

119.    For example, prior to the prescriptions being issued, the Referring Providers never recommended that Insureds first try commonly available commercial products, such as Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% lidocaine and are available in a 2.7 oz. tube at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices in the range of $10.00 or less.

120.    As with the prescriptions for Diclofenac Gel 3%, the initial examination reports prepared by the Referring Providers virtually never set forth the medical basis for the prescription.

121.    Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

122.    The Pharmacy Defendants' egregious billing in predetermined patterns, coupled

with the fact that the Referring Providers failed to properly document the prescriptions for Diclofenac Gel 3% and Lidocaine 5% Ointment, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Referring Providers to have prescribed large volumes of these medications to the Insureds, particularly given the potential for adverse health effects.

### A.    The Fraudulent Pain Patches

123.    As a further part of their scheme, the Pharmacy Defendants routinely billed Liberty Mutual for exorbitantly priced pain patches in primarily in the form of Lidocaine 5% Patches (the "Fraudulent Pain Patches"), pursuant to duplicitous prescriptions solicited from the Referring Providers and facilities, in exchange for kickbacks or other incentives.

124.    In keeping with the fact that the Pharmacy Defendants steered the Referring Providers to prescribe the Fraudulent Pharmaceuticals pursuant to predetermined protocols designed to maximize profits without regard for patient care, the Fraudulent Pain Patches were routinely billed at exorbitant prices despite the fact that there are other, less expensive, commercially available FDA-approved patches.

125.    Topical pain patches in which the primary ingredient is lidocaine (*i.e.*, the Fraudulent Pain Patches) are mainly used to treat chronic post-herpetic neuropathic pain, although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is possibly attributable to its placebo effect rather than the pharmacological action of the patches themselves.

126.    While the application of pain patches with a primary ingredient of lidocaine provides sufficient absorption to cause a partial anesthetic effect – it will never cause a complete sensory block if instructions are followed.

127.    Nevertheless, the Referring Providers routinely prescribed the Fraudulent Pain Patches that were dispensed to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

128.    Like the prescriptions for Diclofenac Gel 3% and Lidocaine 5% Ointment, the Referring Providers never recommended Insureds first use OTC patches containing lidocaine – which are available to treat their often acute, minor strain/sprain injuries.

129.    As with the prescriptions for Diclofenac Gel 3% and Lidocaine 5% Ointment, the initial examination reports prepared by the Referring Providers virtually never set forth the medical basis for the prescription of Fraudulent Pain Patches.

130.    Likewise, the follow-up examination reports virtually never addressed whether the Fraudulent Pain Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

131.    In keeping with the fact that the Defendants acted with gross indifference to patient care and safety, the patients were generally not instructed on the safe use, side effects or risks associated with the Fraudulent Pain Patches.

132.    Moreover, the Referring Providers prescribed, and the Pharmacy Defendants dispensed, Fraudulent Pain Patches contemporaneously to other Fraudulent Pharmaceuticals.

**B.    The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Between the Pharmacy Defendants, Pharmacists, Referring Providers and the Clinic Controllers**

133.    To effectuate the fraudulent scheme, the Defendants steered the Referring Providers to routinely prescribe and direct prescriptions to the Pharmacy Defendants for large volumes of the Fraudulent Pharmaceuticals pursuant to their collusive arrangements, which egregiously

inflated the charges submitted to Liberty Mutual.

134.     New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

135.     Here, the Pharmacy Defendants colluded with Referring Providers associated with various No-Fault Clinics and the unknown clinic controllers, which treat thousands of Insureds, to have the referring medical practitioners, or someone on their behalf, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then have those prescriptions directed to the Pharmacies so that the Pharmacy Defendants could bill Liberty Mutual exorbitant prices for the prescription medication.

136.     The Referring Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of No-Fault Clinics, while the Pharmacy Defendants dispensed, or purported to dispense, the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often being prescribed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were often being prescribed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed as a matter of course without any recommendation that patients first try OTC products.

137.     The Pharmacy Defendants on occasion supplied the Referring Providers and the facilities with preset labels and stamps to steer the Referring Providers to prescribe the Fraudulent

Pharmaceuticals, including the Fraudulent Topical Pain Products and oral medications that the Pharmacy Defendants dispensed to patients of the No-Fault Clinics and to direct those prescriptions to the Pharmacy Defendants.

138.    The purpose of the Pharmacy Defendants supplying the Referring Providers with preset labels and stamps was so that the Referring Providers could repeatedly issue predetermined and/or medically unnecessary prescriptions for the exorbitantly priced Fraudulent Topical Pain Products that the Pharmacy Defendants "specialized" in dispensing in order to exploit the Insureds' No-Fault Benefits.

139.    The Referring Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

140.    The Pharmacy Defendants had no legitimate reason to dispense, or purport to dispense, the Fraudulent Pharmaceuticals that were (i) often prescribed and dispensed without regard to pharmacologic outcomes; (ii) prescribed and dispensed with gross indifference to patient health, care and safety; (iii) prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and (iv) prescribed and dispensed without any attention to cost and fiscal responsibility, because, among other things, all pharmacists in New York are required to conduct a prospective drug review before each prescription is dispensed, which review shall include screening for contraindications, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

141.    The Referring Providers would have not engaged in the illegal, collusive arrangements with the Pharmacy Defendants in violation of New York law, including using preset labels and stamps distributed by the Pharmacy Defendants, intentionally prescribing the

Fraudulent Pharmaceuticals, and directing those prescriptions to the Pharmacy Defendants, unless they profited from their participation in the illegal scheme either by way of direct kickbacks or other financial incentives, such as employment at a No-Fault Clinic.

142.    But for the payment of kickbacks, or other financial incentives from the Pharmacy Defendants, the Prescribing Providers would not have prescribed the Fraudulent Pharmaceuticals, or the volume of the Fraudulent Topical Pain Products, and the Referring Providersand Clinic Controllers would not have directed the prescriptions to the Pharmacies.

143.    The Pharmacy Defendants, referring medical practitioners, and facilities have affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

144.    Nevertheless, based on the circumstances surrounding the illegal, collusive arrangements, the Pharmacy Defendants paid, and continue to pay, a financial kickback or provide other financial incentives, and the referring medical practitioners and facilities received, and continue to receive, a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that are dispensed by the Pharmacies.

145.    Upon information and belief, the payment of kickbacks was made at or near the time the prescriptions were issued.

**C.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to Liberty Mutual**

146.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged. Each NDC number has an assigned Average Wholesale Price ("AWP").

147.    Each NDC (and, thus, the AWP) for a particular prescription product differs

depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained. The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

148.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee Schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

149.    For each generic drug (or the ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

150.    The Pharmacy Defendants solicited the referring medical practitioners and facilities to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products so they could bill Liberty Mutual and other New York No-Fault insurers for the exorbitantly priced pharmaceuticals products.

151.    The Pharmacy Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive assigned AWP's or "list prices", in order to inflate the billing submitted through the Pharmacies so as to maximize their profits.

152.    The Pharmacy Defendants purported to provide the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, directly to Liberty Mutual Insureds, and sought reimbursement directly from Liberty Mutual pursuant to executed "Assignment of Benefit" ("AOB") forms.

153.    In support of their charges, the Pharmacy Defendants typically submitted: (i) the Prescribing Providers' prescriptions; (ii) an itemized pharmacy form, which includes the patient's

name, the prescribed pharmaceutical, the purported NDC numbers, and corresponding charges for each drug product, the prescribing provider, and the date on which the pharmaceutical was prescribed and filled by the pharmacy; and (iii) the AOB assigning the Insureds' benefits to the Defendants.

154.    The NDC numbers listed on the itemized pharmacy forms submitted by the Pharmacy Defendants identify the assigned AWPs for each of the prescription drug.

155.    The Pharmacy Defendants never submitted their wholesale purchase invoices demonstrating: (i) how much the Pharmacy Defendants actually paid the supplier for the Fraudulent Pharmaceuticals; and (ii) whether the Pharmacy Defendants actually purchased the Fraudulent Pharmaceuticals with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

156.    In fact, the Pharmacy Defendants never actually paid the targeted and egregious assigned AWP of the Fraudulent Pharmaceuticals that they dispensed, or purported to dispense, because it is not a true representation of the actual market price and is far above the actual acquisition cost for the Fraudulent Pharmaceuticals.

157.    Nevertheless, the Defendants billed Liberty Mutual and other No-Fault insurers egregious amounts far surpassing the cost of a wide variety of other medications, including other formulations of the same drug in some instances.

**E.    The Examination Under Oath of Ideal**

158.    On January 11, 2022, Ideal appeared for an Examination Under Oath ("EUO") as part of Liberty Mutual's investigation.  Ideal produced its reported owner, Naishuler, for the purposes of the EUO.

159.    During the EUO, Naishuler testified that he does not know the names of the medical

practitioners whose "prescriptions" Ideal was filling, including not knowing the names of Drs. Rehman, Baldonado, Pak, Gelb and Zilberman.

160.    During the EUO, Naishuler testified that he is not familiar with the names of the medical offices where the "prescriptions" Ideal fills are coming from nor was he aware that certain medical office locations were the sources of the "prescriptions".

161.    Naishuler also testified during his EUO that if he was aware that Ideal was filling fraudulent prescriptions, he would return the funds to the payee.   Despite being provided information that Ideal was filling fraudulent prescriptions, Ideal and Naishuler have failed to return any money to Liberty Mutual.

162.    Moreover, as part of the ongoing investigation into the eligibility of Ideal, Plaintiffs requested that Ideal provide additional information, document and verification as a result of the testimony provided by Ideal at its examination under oath.

163.    Despite the fact that Ideal had a condition precedent to coverage to provide the requested information, it refused to do so.

## VII.    The Defendants' Fraudulent Concealment and Plaintiffs' Justifiable Reliance

164.    The Pharmacy Defendants have submitted, or caused to submitted, a voluminous number of NF-3, HCFA-1500 forms, and supporting documentation to the Plaintiffs seeking payment for Fraudulent Pharmaceuticals it knowingly knew it was not entitled to receive.   A representative sample of the Pharmacy Defendants fraudulent submissions are attached to the charts annexed hereto as **Exhibits "2", "3", and "4."**

165.    The NF-3, HCFA-1500 forms, and supporting documentation submitted to the Plaintiffs contained material misrepresentations claiming the Fraudulent Pharmaceuticals were

medically necessary when they were provided, to the extent they were provided at all, pursuant to a fraudulent treatment protocol.

166.    The NF-3, HCFA-1500 forms, and supporting documentation submitted to the Plaintiffs contained misrepresentations exaggerating the level and nature of the Fraudulent Pharmaceuticals provided, to the extent they were provided at all, as the Fraudulent Pharmaceuticals were provided pursuant to a fraudulent treatment protocol.

167.    The Pharmacy Defendants disregarded legal and ethical obligations by submitting, or causing to be submitted, billing that it knew contained material misrepresentations.

168.    In order to compel the Plaintiffs to pay for the Fraudulent Pharmaceuticals for which they were charged, the Pharmacy Defendants took concerted efforts to conceal their illicit operation. To prevent the Plaintiffs from detecting that the Fraudulent Pharmaceuticals were prescribed pursuant to a fraudulent treatment protocol, the Pharmacy Defendants intentionally misrepresented and concealed facts that would have exposed itself.

169.    Specifically, the Pharmacy Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that: (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive, kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing to Liberty Mutual and other New York insurance companies.

170.    The Pharmacy Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single license, and further billed for

multiple drug products, including various oral medications, in order to conceal the scheme to exploit the Insureds for financial gain

171.    The Pharmacy Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple referring medical practitioners operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single license, and further billed for multiple drug products, including various oral medications, in order to conceal the scheme to exploit the Insureds for financial gain.

172.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, does not reveal its fraudulent nature.

173.    In fact, the Pharmacy Defendants continue to have legal counsel pursue collection against Liberty Mutual and other insurers without regard for the fact that at least one the Pharmacies have ceased active operations, and is no longer registered as an active pharmacy with New York State Department of Education.

174.    While the Plaintiffs grew suspicious of the Pharmacy Defendants' billing, they continued throughout the course of their investigation to abide by claim procedures set forth in the No-Fault regulations concerning the issuance of No-Fault denials and requests for additional verification.

175.    As a result, the Plaintiffs either: (i) timely paid claims; (ii) timely and appropriately denied claims for No-Fault benefits submitted by the Pharmacy Defendants; or (iii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault benefits submitted by the Pharmacy Defendants, and, therefore, the Plaintiffs' time to pay or deny claims has not yet expired.

176. The Plaintiffs are statutorily and contractually obligated to swiftly and fairly process claims within thirty days upon receipt. The NF-3, HCFA-1500 forms, and supporting documentation submitted to the Plaintiffs, containing the material misrepresentations described above, were submitted to induce payment by the Plaintiffs who were led to justifiably rely on them causing Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company to incur actual and potential damages of more than Eight Hundred Thousand Dollars in damages.

177. The Plaintiffs undertook a long investigation which comprised of collecting all fraudulent billing and medical reports for inspection and comparison, interviewing Insureds, interviewing the referring medical practitioners, conducting on-site inspections of the various hub facilities and database searches.

178. As the investigation only recently concluded, the Plaintiffs were unable to minimize their damages until the results of the investigation were available.  This complaint was filed immediately after it was determined that the services rendered were fraudulent and in violation of New York Law and public policy.

## VIII.   Requirement to Appear for an EUO

179. The No-Fault Regulation (the "Regulation") governs all claims for injuries made as a result of an automobile accident within the State of New York.

180. The Regulation provides certain tools and mechanisms for an insurance carrier to

investigate an accident and to confirm the durable medical equipment allegedly supplied as a result

of any accident – this is done through conditions precedent to coverage or verification requests.

181.   The conditions precedent to coverage states the following at 11 NYCRR 65-1.1:

MANDATORY   PERSONAL   INJURY   PROTECTION ENDORSEMENT, SECTION I, *Conditions*

No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage.
      *                    *                    *

Proof of Claim; Medical, Work Loss, and Other Necessary Expenses. In the case of a claim for health service expenses, **the eligible injured person or that person's assignee or representative shall** submit written proof of claim to the Company, including full particulars of the nature and extent of the injuries and treatment received and contemplated, as soon as reasonably practicable but, in no event later than 45 days after the date services are rendered. The eligible injured person or that person's representative shall submit written proof of claim for work loss benefits and for other necessary expenses to the Company as soon as reasonably practicable but, in no event, later than 90 days after the work loss is incurred or the other necessary services are rendered. The foregoing time limitations for the submission of proof of claim shall apply unless the eligible injured person or that person's representative submits written proof providing clear and reasonable justification for the failure to comply with such time limitation. **Upon request by the Company, the eligible injured person or that person's assignee or representative shall**:

(a)   execute a written proof of claim under oath;

(b)   as may reasonably be required **submit to examinations under oath by any person named by the Company** and subscribe the same;

(c)   provide authorization that will enable the Company to obtain medical records; and

(d)   **provide any other pertinent information that may assist the Company** in determining the amount due and payable. (emphasis added)

182.    11 NYCRR 65-3.5(c) states that the "insurer is entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested." Section 11 NYCRR 65-3.8(f) dictates that nothing in the Regulation shall prevent an insurer from requesting full and complete proof of claim prior to the issuance of any payments or denials.

183.    The provision of the Conditions section that states "[n]o action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage" has been interpreted by the Courts as establishing a condition precedent to coverage.

184.    The Appellate Term of the Supreme Court held in W&Z Acupuncture, P.C. v. Amex Assurance Company, 901 N.Y.S.2d 903 (App. Term, 2d Dep't 2009) that the appearance of a medical provider at an examination under oath is a condition precedent to coverage. Specifically, the Court held that the "appearance of the eligible injured person's assignee at an EUO is a condition precedent to the insurer's liability on the policy." Id.

185.    Pursuant to the applicable policy provisions, the Defendants were obligated to appear and complete an EUO as a condition precedent to coverage. Dover Acupuncture, P.C. v State Farm Mut. Auto. Ins. Co., 28 Misc. 3d 140(A), 958 N.Y.S.2d 60 (App. Term, 1st Dep't 2010).

186.    11 NYCRR § 65-3.5(c) states that the "insurer is entitled to receive all items necessary to verify the claim directly from the parties from whom such verification was requested." Section 11 NYCRR 65-3.8(f) dictates that nothing in the Regulation shall prevent an insurer from requesting full and complete proof of claim prior to the issuance of any payments or denials.

187.    It has been uniformly held that the No-Fault Regulation's requirement for an eligible injured person or their assignee to appear for an Examination Under Oath is a condition

precedent to an insurer's liability under the policy. *See,* Interboro Ins. Co. v. Clennon, 2014 NY Slip Op 00092 (App. Div., 2d Dep't 2014), *citing*, Unitrin Advantage Ins. Co. v. Bayshore Physical Therapy, PLLC, et al., 918 N.Y.S.2d 473, 82 A.D.3d 559, 560 (App. Div., 1st Dep't 2011), *leave denied,* 17 N.Y.3d 705 (2011); *See, e.g.,* Dover Acupuncture, P.C. v State Farm Mut. Auto. Ins. Co., 28 Misc. 3d 140(A), 958 N.Y.S.2d 60 (App. Term, 1st Dep't 2010) (a provider's non-appearance warranted dismissal based upon "plaintiff's failure to comply with a condition precedent to coverage"); Five Boro Psychological Servs., P.C. v Progressive Northeastern Ins. Co., 27 Misc. 3d 141(A), 911 N.Y.S.2d 392 (App. Term, 2d Dep't 2010) ("the appearance of plaintiff's assignor at an EUO was a condition precedent to defendant insurer's liability on the policy"); Stephen Fogel Psychological, P.C. v. Progressive Cas. Ins. Co. 35 A.D.3d 720, 722, 827 N.Y.S.2d 217, 219 (App. Div. 2nd Dept., 2006) ("[t]he appearance of the insured for IMEs at any time is a condition precedent to the insurer's liability on the policy").

188.    Once an eligible injured person, or their assignee, fails to comply with a condition precedent as set forth in the policy endorsements at 11 NYCRR § 65-1.1, such as a medical examination or examination under oath, the carrier's requirement to timely deny the bill is vitiated and the policy is void, *ab initio*. Unitrin Advantage Ins. Co. v. Bayshore Physical Therapy, PLLC, 82 A.D.3d 559 (App. Div., 1st Dep't 2011)*, citing,* Central Gen. Hosp. v Chubb Group of Ins. Cos., 90 N.Y.2d 195 (1997).

189.    Pursuant to the No-Fault Regulation, the Pharmacy Defendants had an absolute condition precedent to coverage to appear for an EUO.

A.    Liberty Mutual's Reasonable Basis for Requesting the EUO

190.    According to the Department of Insurance, N.Y. Comp. Codes R. & Reg. tit. 11 § 65-3.5(e) does not require an insurance carrier to provide a reasonable basis for requesting an

EUO.  A copy of New York State's Insurance Department Opinion dated December 22, 2006, is annexed hereto as **Exhibit "7"**.

191.    Nevertheless, Liberty Mutual's reasons for requesting the EUO of Pharmacy Defendants is detailed in this pleading when the history of the fraudulent scheme, its present-day application and the fraudulent treatment protocol dictating the prescription of Fraudulent Pharmaceuticals allegedly filled by the Pharmacy Defendants.

B.    <u>AVK is not eligible to Receive No-Fault Reimbursements by Failing to Appear for an EUO</u>

192.    By refusing and failing to appear for an EUO, the Pharmacy Defendants have breached a condition precedent to coverage – the failure to meet this condition precedent to coverage leaves the Defendants ineligible to receive No-Fault reimbursements.

193.    The No-Fault Regulation contains explicit language in 11 NYCRR 65-1.1 that there shall be no liability on the part of the No-Fault insurer if there has not been full compliance with the conditions precedent to coverage.  Specifically, 11 NYCRR 65-1.1 states:

> No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with the terms of this coverage.

194.    One such condition contained within the Regulation is the appearance of the Pharmacy Defendants at an EUO.

195.    The Regulation mandates at 11 NYCRR 65-1.1 that:

> Upon request by the Company, the eligible injured person or that person's assignee or representative shall:
>
> (a) execute a written proof of claim under oath;
>
> (b) as may reasonably be required submit to examinations under oath by any person named by the Company and subscribe the same;

(c) provide authorization that will enable the Company to obtain
medical records; and

(d) provide any other pertinent information that may assist the
Company in determining the amount due and payable.

196.    The failure of AVK to appear at an EUO renders AVK ineligible to receive No-

Fault reimbursements from Liberty Mutual for any prescriptions/supplies that were issued by the

AVK for the claim in which the EUO of the Defendant was sought and AVK failed to appear.   A

chart detailing by claim number, the receipt of AVK's bills, the issuance of verification requests,

the scheduling of the EUO and the timely denial of the claim is attached hereto as **Exhibits "5"**

(AVK).

197.    The Appellate Term of the Supreme Court held in W&Z Acupuncture, P.C. v.

Amex Assurance Company, 901 N.Y.S.2d 903 (App. Term, 2d Dep't 2009) that the appearance of

a medical provider at an examination under oath is a condition precedent to coverage.   Specifically,

the Court held that the "appearance of the eligible injured person's assignee at an EUO is a

condition precedent to the insurer's liability on the policy."   *See also*, Fogel v. Progressive, 35

A.D.3d 720 (App. Div., 2d Dep't 2006).

198.    Moreover, as cited by the Appellate Term in W&Z, the No-Fault Regulation itself

places an unconditional obligation on the Defendant to appear for an examination under oath.   The

No-Fault Regulation requires the Defendant to appear for an examination under oath as demanded

by Liberty Mutual.   The Defendants' refusal and failure to appear for an EUO is a violation of the

No-Fault Regulation.

199.    The Appellate Division, First Department, held that where there is a failure to

comply with a condition precedent to coverage, an insurer has "the right to deny all claims

retroactively to the date of loss, regardless of whether the denials were timely issued.   Unitrin

<u>Advantage Ins. Co. v. Bayshore Physical Therapy, PLLC, et al.</u>, 918 N.Y.S. 2d 473 (App. Div., 1st Dep't. 2011), *leave to appeal denied,* 17 N.Y.2d 705 (N.Y. 2011).

200.     Based upon AVK's breach of a condition precedent to coverage by failing to appear for an EUO, Liberty Mutual is under no obligation to honor or pay for the claim in which the EUO of AVK was sought and AVK failed to appear.  A chart detailing by claim number, the receipt of AVK's bills, the issuance of verification requests, the scheduling of the EUO and the timely denial of the claim is attached hereto as **Exhibit "5"** (AVK).

**IX.     Requirement to Provide Verification**

201.     No-Fault benefits become overdue "if not paid within 30 calendar days after the insurer receives proof of claim[.]" 11 NYCRR § 65-3.8(a)(1). However, as explained by the Court of Appeals, the language of the Regulation "contemplates that an insurer must pay or deny only a *verified* claim…within 30 calendar days of receipt; and, conversely, is not obligated to pay any claim until it has been so verified." <u>Nyack Hosp. v. General Motors Acceptance Corp.</u>, 8 N.Y.3d 294 (2007) (emphasis added). Indeed, a claim is only deemed submitted when the insurer receives "all of the relevant information requested pursuant to section 65-3.5 of this subpart." 11 NYCRR § 65-3.8 (a)(1).

202.     If verification requests were timely issued, and the provider failed to respond, the proof of claim was not deemed received and cannot be considered overdue. An action premised upon a payment that is not overdue is premature and must be dismissed. <u>Hosp. for Joint Diseases v. New York Cent. Mut. Fire Ins. Co.</u>, 44 A.D.3d 903, 904 (N.Y. App. Div. 2d Dep't 2007), <u>citing</u> <u>Westchester County Med. Ctr. v. New York Cent. Mut. Fire Ins. Co.</u>, 262 A.D.2d 553 (N.Y. App. Div. 2d Dep't 1999).

203.    The New York No-Fault Regulation, 65-3.8 states the insurer has thirty (30) days after proof of claim is received in which to pay or deny the bill before it is considered "overdue." *See* N.Y. Comp. Codes R. Regs. Title 11 section 65.15(g)(3).

204.    However, Regulation 68 also provides that within ten (10) days after receipt of the application for no-fault benefits, or a bill for payment of benefits, the carrier may request additional verification.  This "verification request" shall request all information that the carrier requires prior to payment of the claim. 11 N.Y.C.R.R. § 65.15(d)(1).

205.    The Regulation also provides that "[t]he insurer is entitled to receive all items necessary to verify the claim from the parties from whom such verification is requested." *Id*.  "[A]ny additional verification required by the insurer to establish proof of claim shall be requested within 15 business days of receipt of the prescribed verification forms.  Any requests by an insurer for additional verification need not be made on any prescribed or particular form." *Id.* at § 65.3.5(b).

206.    In the event that the requested verification is not received by the insurer within thirty (30) days from the date of the request, the Regulation imposes a duty upon the insurer to follow-up with the request.  In order to comply with the mandates of the Regulation, the insurer must, within ten (10) days, follow-up by either a telephone call to the party from whom the verification is requested, which is properly documented in the file, or by mail. *Id*. at § 65.15(e)(2). Thereafter, the claim is considered "indefinitely tolled" as "[n]othing in the rules requires a second follow-up, that is, a third request for verification."  <u>Sound Shore Med. Ctr. v. New York Cent. Mut. Fire Ins. Co.</u>, 106 A.D.3d 157, 163 (N.Y. App. Div. 2d Dep't 2013). It is as if a bill was never submitted and any further requests or denials cannot be untimely as the 30-day period to pay-or-

deny the claim "never commenced." Westchester County Med. Ctr. v. New York Cent. Mut. Fire Ins. Co., 262 A.D.2d 553, 555 (N.Y. App. Div. 2d Dep't 1999).

207.    However, as of April 1, 2013, this rule was modified.  If the carrier has complied with regulatory mandates, and if the verification still has not been received, the carrier is within its rights to deny the claim in its entirety but is not required to do so.  See 11 NYCRR §65.3.8(b)(3)

208.    Specifically, for services rendered after April 1, 2013, 11 NYCRR §65-3.8(b) permits an insurance carrier that has requested additional verification from an applicant to deny the applicant's claim(s) if the requested verification or proof providing a reasonable justification for the applicant's failure to provide the verification is not received within 120 calendar days from the date of the initial verification request.  11 NYCRR §65-3.8(b).  A copy of the Fourth Amendment to Regulation 68-C is annexed hereto as **Exhibit "8".**

209.    Additional verification includes all information that is necessary for the insurer to determine whether the claim is payable.  *See* Nyack Hosp. v. General Motors Acceptance Corp., 27 A.D.3d 96 (N.Y. App. Div. 2d Dep't 2005) (the provider's proof of claim requirement under the regulation includes providing the insurer with all additional verification timely requested pursuant to 11 NYCRR § 65-3.5); *see also* Hospital for Joint Diseases v. Respondent Mutual Automobile Insurance Company, 8 A.D.3d 533 (N.Y. App. Div. 2d Dep't 2004).

210.    Ideal's failure to provide or respond in any way cannot be excused, as the Appellate Division has stated inaction is not a proper response.  "Any confusion on the part of the plaintiff as to what was being sought should have been addressed by further communication, not inaction" *See* Westchester County Medical Center v. New York Central Mutual Fire Ins. Co., 262 A.D.2d 553 (N.Y. App. Div. 2d Dep't 1999).

211.    Ideal has violated the terms and conditions under the applicable policies of insurance by failing to provide the documentation requested in Plaintiffs' verification requests within 120 calendar days from the date of the initial verification request pursuant 11 NYCRR §65-3.5(o).  ideal's claims were properly denied as Liberty Mutual did not receive the requested verification within one hundred twenty (120) calendar days of issuing its initial verification request.

212.    Based upon Ideal's breach of a condition precedent to coverage by failing to cooperate and provide requested verification, Liberty Mutual is under no obligation to honor or pay for the claim in which Ideal failed to provide requested verification.  A chart detailing by claim number, the receipt of Defendants' bills, the issuance of verification requests scheduling of the EUO of Ideal and the subsequent issuance of verification requests for additional information that was never submitted, and the timely denial of the claim is attached hereto as **Exhibits "6"** (Ideal).

### X.    The Law Pertaining to Racketeer Influenced and Corrupt Organizations

213.    The Organized Crime Control Act of 1970 was established in order to prevent and punish racketeering activity.  *See* 18 U.S.C. §1962.

214.    Under 18 U.S.C.A. §1962(c)-(d):

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
> (d) It shall be unlawful for any person to conspire to violate any provisions of subsection (a), (b), or (c) of this section.

215.    Under 18 U.S.C.A. §1964 (a) (Civil Remedies):

> The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including,

but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons.

216.     In addition to providing a mechanism to counter criminal activities, the RICO statute also establishes and provides for a private enforcement scheme for violations of the RICO statute.

217.     18 U.S.C. §1964(c) states:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

218.     The Defendants named herein violated 18 U.S.C. §1962 (c) and (d).

219.     18 U.S.C.A. §1961(3) defines a "person" as an "entity capable of holding a legal or beneficial interest in property."

220.     "Racketeering activity" is defined in 18 U.S.C.A. § 1961 and includes any act which is indictable under 18 U.S.C.A. §1341, relating to mail fraud which affects interstate commerce.

221.     18 U.S.C.A. §1964(c) reads in relevant part as follows:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee…

222.     Defendants' conduct constitutes a violation of the provisions of the RICO statute and Plaintiffs are entitled to recovery of damages.

**CLAIMS FOR RELIEF**
**FIRST CAUSE OF ACTION**
**Against AVK, Ideal, and Essential**
**(Declaratory Judgment - 28 U.S.C. §§2201 and 2202-Fraudulent Treatment Protocol)**

223.    Liberty Mutual incorporate, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 221 above.

224.    There is an actual case in controversy between Liberty Mutual and the Defendants regarding more than Nine Hundred Forty-Five Thousand Dollars ($945,000.00) in submitted claims with a total amount of damages incurred, inclusive of expenses, in excess of One Hundred and Seventy Thousand Dollars ($170,000.00).

225.    The Pharmacy Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because the Fraudulent pharmaceuticals were not medically necessary and were provided, the extent they were provided at all, pursuant to a pre-determined protocol that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

226.    The Pharmacy Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because the codes used for the Fraudulent Pharmaceuticals misrepresented and exaggerated the medications and supplies that purportedly were provided in order to inflate the charges submitted to Liberty Mutual.

227.    The Pharmacy Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because the fraudulent, pre-determined treatment protocol was subject to the direction and control of persons not licensed to practice medicine, resulting in the performance and billing for unnecessary and inflated charges to Liberty Mutual.

228.    Accordingly, Liberty Mutual requests a judgment pursuant to 28 U.S.C. §§2201 and 2202, declaring that the Pharmacy Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual.

## SECOND CAUSE OF ACTION
### Against AVK
**(Declaratory Judgment - 28 U.S.C. §§2201 and 2202- Breach of a Condition Precedent – Failure to Appear for an Examination Under Oath)**

229.    Liberty Mutual incorporate, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 227 above.

230.    There is an actual case in controversy between Liberty Mutual and the Defendants regarding more than Nine Hundred Forty-Five Thousand Dollars ($945,000.00) in submitted claims with a total amount of damages incurred, inclusive of expenses, in excess of One Hundred and Seventy Thousand Dollars ($170,000.00).

231.    By virtue of AVK's failure to appear for an EUO, the Defendant breached a material condition precedent to coverage established by the No-Fault Regulation and the subject policy of insurance.  The chart attached hereto as **Exhibit "5" (AVK)** demonstrates the failure of AVK to appear for two duly scheduled examinations under oath, rendering AVK ineligible to receive No-Fault reimbursements for the claims in which an EUO was requested and for which the provider failed to appear.

232.    The breach of a condition precedent to coverage has rendered AVK ineligible to receive No-Fault reimbursements from Liberty Mutual.

233.    Accordingly, Liberty Mutual requests a judgment pursuant to 28 U.S.C. §§2201 and 2202, declaring that Liberty Mutual is under no obligation to pay, honor or reimburse AVK for the claim(s) submitted for which an examination under oath was sought and for which the Defendants failed to appear.

## THIRD CAUSE OF ACTION
### Against Ideal
**(Declaratory Judgment - 28 U.S.C. §§2201 and 2202- Breach of a Condition Precedent – Failure to Provide Requested Verification)**

234.    Liberty Mutual incorporate, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 232 above.

235.    There is an actual case in controversy between Liberty Mutual and the Defendants regarding more than Nine Hundred Forty-Five Thousand Dollars ($945,000.00) in submitted claims with a total amount of damages incurred, inclusive of expenses, in excess of One Hundred and Seventy Thousand Dollars ($170,000.00).

236.    By virtue of Ideal's failure to provide information and documentation sought by the Plaintiffs via their regulatory supported requests for additional verification, Ideal breached a material condition precedent to coverage established by the No-Fault Regulation.  The chart detailing by claim number, the receipt of Defendant's bills, the issuance of verification requests scheduling of the EUO of Ideal and the subsequent issuance of verification requests for additional information that was never submitted, and the timely denial of the claim is attached hereto as **Exhibits "6"**.

237.    The breach of a condition precedent to coverage has rendered Ideal ineligible to receive No-Fault reimbursements from Liberty Mutual.

238.    Accordingly, Liberty Mutual requests a judgment pursuant to 28 U.S.C. §§2201 and 2202, declaring that Liberty Mutual is under no obligation to pay, honor or reimburse Ideal for the claim(s) submitted for which Ideal failed to provide the requested verification.

## FOURTH CAUSE OF ACTION
### Against All Defendants
### (Common Law Fraud)

239.    Liberty Mutual incorporate, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 237 above.

240.     The Defendants knowingly made false and fraudulent statements of material fact to Liberty Mutual in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent pharmaceuticals.

241.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed services, supplies and pharmaceuticals were medically necessary, when in fact the billed services, supplies and pharmaceuticals were not medically necessary and were performed pursuant to a pre-determined protocol that was subject to the direction and control by unlicensed persons and that enriched the Defendants; (ii) in every claim, the representation that the billing appropriately reflected the pharmaceuticals issued/dispensed, when in fact the billing information used for the Fraudulent Pharmaceuticals and the manner in which the pharmaceuticals were prescribed and dispensed, to the extent they were dispensed at all, were misrepresented and exaggerated in order to inflate the charges submitted to Liberty Mutual.

242.     The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce Liberty Mutual to pay charges submitted through the Pharmacy Defendants which were not compensable under the No-Fault laws.

243.     Liberty Mutual have been injured in its business and property by reason of the above-described conduct in that it has paid at least One Hundred Seventy Thousand Dollars ($170,000.00) pursuant to the fraudulent bills submitted by the Defendants through the Pharmacy Defendants.

244.    Accordingly, by virtue of the foregoing, Liberty Mutual are entitled to compensatory damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against all Defendants**
**(Unjust Enrichment)**

245.    Liberty Mutual incorporate, as though fully set forth herein, each and every allegation in paragraphs 1 through 243 above.

246.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of Liberty Mutual.

247.    When Liberty Mutual paid the bills and charges submitted by or on behalf of the Pharmacy Defendants for No-Fault benefits, they reasonably believed that they were legally obligated to make such payments based on the Defendants' improper, unlawful and/or unjust acts.

248.    The Defendants have been enriched by payment from Liberty Mutual which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

249.    Defendants' retention of payments from Liberty Mutual violates fundamental principles of justice, equity and good conscience.

250.    The Pharmacy Defendants, additionally, in attempts to avoid detection and in furtherance of the scheme for Fraudulent Pharmaceuticals, conferred benefits to the Referring Providers and the unknown clinic controllers.

251.    The layperson owners and managers were financially enriched by payment from the Pharmacy Defendants, which included funds disbursed from payments made by Liberty Mutual to the Pharmacy defendants.  These payments were made specifically to assist the Pharmacy

defendants in continuing the scheme for fraudulent supplies and pharmaceuticals without interruption for the period of time when the scheme was active.

252.    The referring medical practitioner and facilities, as part of the scheme, and aware that the scheme and its proceeds were improper, unlawful and unjust, knowingly accepted the proceeds of the scheme through their association to the Pharmacy Defendants.

253.    The defendants were further financially enriched by distribution of the payments made from Liberty Mutual to the defendants and layperson owners which were made knowingly with the intent to disburse funds received as part of the illicit arrangement to bill for Fraudulent Pharmaceuticals.

254.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than One Hundred Seventy Thousand Dollars ($170,000.00).

<u>**SIXTH CAUSE OF ACTION**</u>
**Against AVK, Aronova, and the Referring Providers**
**(Violation of RICO, 18 U.S.C. §1962(c))**
**(AVK Enterprise)**

255.    Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company incorporate, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 253 above.

## ENTERPRISE

256.    AVK is a legal entity and thus is an "enterprise," as that term is defined in 18 U.S.C. §1961(4).  This legal entity enterprise engages in activities which affect interstate commerce as the pharmacy bills patients who reside in different states, and the pharmacy, in the conducting of its business, purchases goods and services manufactured in different states which are transported to the Pharmacy by means of interstate commerce

## DEFENDANTS

257.    Defendants, Irina Aronova, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. are "persons" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

258.    Defendants Aronova and the Referring Providers are distinct of AVK which is a separately incorporated entity.  257.  Defendants Aronova and the Referring Providers are or were employed by and/or associated with the AVK Enterprise.

## RACKETEERING VIOLATION

259.    Defendants, Irina Aronova, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. knowingly conducted and/or participated, directly or indirectly, in the conduct of AVK's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent bills over the course of more than five years, all in violation of 18 U.S.C. § 1962(c).  *See* a representative sampling of the claims submitted by AVK to Liberty Mutual through the Unites States Postal Service (USPS) which are annexed hereto as **Exhibit "2".**

260.     AVK was not eligible to receive payments because: (i) the services billed for were not provided and/or were not provided as billed; (ii) the services billed for were not medically necessary and were performed solely to maximize billing; (iii) the billed-for-services were performed pursuant to a pre-determined, fraudulent treatment and billing protocol; (iv) the services were rendered to patients who were obtained as a result of illegal kickbacks and/or fraudulent prescriptions; and (v) AVK failed to appear for Examination Under Oath as requested.

## PATTERN OF RACKETEERING ACTIVITY

261.     AVK submits fraudulent charges to insurers.  The racketeering activity of mail fraud is separate from the activities of AVK which is to provide services to patients.  Plaintiffs allege that the course of conduct engaged in by the RICO defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).  Plaintiffs can show the relatedness prong because the predicate acts of mail fraud have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise," which was to submit fraudulent charges to insurers.  All predicate acts have the same purpose of defrauding the Plaintiffs through mailings from AVK to Plaintiffs which further the fraudulent scheme involving billing for services not provided, billing for medically unnecessary services; and billing for services rendered to patients obtained through the payment of kickbacks.

262.     Plaintiffs allege that the continuity of the pattern of racketeering activity is closed-ended inasmuch as the scheme, from its inception, extends for a period of at least two (2) years.  Moreover, the scheme may be found to be "open-ended" continuity because the predicate scheme of mail fraud is the regular way in which Defendants, Irina Aronova, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor

Zilberman, M.D. operated AVK insofar as AVK was never eligible to bill for or collect No-Fault benefits, and acts of mail fraud, therefore, are/were essential in order for AVK to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the ongoing submission of claims for reimbursements and continued attempt to collect on any claims.

263.    AVK continues to submit and/or attempt collection of the fraudulent billing to the detriment of Liberty Mutual.

## CONDUCTING AFFAIRS OF THE ENTERPRISE

264.    The Defendants participated in the "operation or management" of AVK's affairs in order to affect the fraudulent scheme.  In this regard, Irina Aronova, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. were able to create and implement a pre-determined protocol for the rendition of medical services, without regard to the nature and extent of the injuries of the alleged party.  This pre-determined protocol included excessive and unnecessary patient examinations. The actions were taken by the Defendants solely to generate the largest possible amount of billing to be submitted to No-Fault insurers, including Liberty Mutual.

## INJURY TO BUSINESS AND PROPERTY

265.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at in excess of Eighty-Five Thousand Dollars ($85,000.00) pursuant to the fraudulent bills submitted by the Defendants as to AVK.

266.    By reason of its injury, proximately and directly caused by the Defendants illegal predicate activity, Liberty Mutual is entitled to Treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against AVK, Aronova, and the Referring Providers**
**(Violation of RICO, 18 U.S.C. §1962(d))**
**(AVK Enterprise)**

267.    Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company incorporate, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 265 above.

268.    Defendants, Irina Aronova, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

269.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least Eighty-Five Thousand Dollars ($85,000.00) pursuant to the fraudulent bills submitted by the Defendants through AVK.

270.    By reason of its injury, directly and proximately caused by the fraudulent scheme, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Essential, Abramov, Manning and Referring Providers
### (Violation of RICO, 18 U.S.C. §1962(c))
### (Essential Enterprise)

271.    Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company incorporate, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 269 above.

### ENTERPRISE

272.    Essential is a legal entity and thus is an "enterprise," as that term is defined in 18 U.S.C. §1961(4).   This legal entity enterprise engages in activities which affect interstate commerce as the pharmacy bills patients who reside in different states, and the pharmacy, in the conducting of its business, purchases goods and services manufactured in different states which are transported to the Pharmacy by means of interstate commerce

### DEFENDANTS

273.    Defendants, Gregory Abramov, David Manning, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D., are "persons" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).   Defendants Gregory Abramov, David Manning, and the Referring Providers are distinct of Essential which is a separately incorporated entity. Defendants Gregory Abramov, David Manning, and the Referring Providers are or were employed by and/or associated with the "Essential" Enterprise.

## RACKETEERING VIOLATION

274.    Defendants, Gregory Abramov, David Manning, Alexander Baldonado, M.D.,

Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor

Zilberman, M.D. knowingly conducted and/or participated, directly or indirectly, in the conduct

of AVK's affairs through a pattern of racketeering activity consisting of repeated violations of the

federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit

or cause to be submitted thousands of fraudulent bills over the course of more than five years, all

in violation of 18 U.S.C. § 1962(c).  *See* a representative sampling of the claims submitted by

Essential to Liberty Mutual through the Unites states Postal Service (USPS) which are annexed

hereto as **Exhibit "3".**

275.    Essential was not eligible to receive payments because: (i) the services billed for

were not provided and/or were not provided as billed; (ii) the services billed for were not medically

necessary and were performed solely to maximize billing; (iii) the billed-for-services were

performed pursuant to a pre-determined, fraudulent treatment and billing protocol; and (iv) the

services were rendered to patients who were obtained as a result of illegal kickbacks and/or

fraudulent prescriptions.

## PATTERN OF RACKETEEING ACTIVITY

276.    Essential submits fraudulent charges to insurers. The racketeering activity of mail

fraud is separate from the activities of Essential which is to provide services to patients.  Plaintiffs

allege that the course of conduct engaged in by the RICO defendants constituted both "continuity"

and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering

activity, as that term is defined in 18 U.S.C. § 1961(5).  Plaintiffs can show the relatedness prong

because the predicate acts of mail fraud have "similar purposes, results, participants, or methods

of commission or are related to the affairs of the Enterprise," which was to submit fraudulent charges to insurers. All predicate acts have the same purpose of defrauding the Plaintiffs through mailings from Essential to Plaintiffs which further the fraudulent scheme involving billing for services not provided, billing for medically unnecessary services; and billing for services rendered to patients obtained through the payment of kickbacks.

277.    Plaintiffs allege that the continuity of the pattern of racketeering activity is closed-ended inasmuch as the scheme, from its inception, extends for a period of at least two (2) years. Moreover, the scheme may be found to be "open-ended" continuity because the predicate scheme of mail fraud is the regular way in which Defendants, Gregory Abramov, David Manning, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. operated Essential insofar as Essential was never eligible to bill for or collect No-Fault benefits, and acts of mail fraud, therefore, are/were essential in order for Essential to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the ongoing submission of claims for reimbursements and continued attempt to collect on any claims.

278.    Essential continues to submit and/or attempt collection of the fraudulent billing to the detriment of Liberty Mutual.

## CONDUCTING AFFAIRS OF THE ENTERPRISE

279.    The Defendants participated in the "operation or management" of Essential's affairs in order to affect the fraudulent scheme. In this regard, Gregory Abramov, David Manning, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. were able to create and implement a pre-

determined protocol for the rendition of medical services, without regard to the nature and extent of the injuries of the alleged party. This pre-determined protocol included excessive and unnecessary patient examinations. The actions were taken by the Defendants solely to generate the largest possible amount of billing to be submitted to No-Fault insurers, including Liberty Mutual.

## INJURY TO BUSINESS AND PROPERTY

280. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at in excess of Twenty-Seven Thousand Dollars ($27,000.00) pursuant to the fraudulent bills submitted by the Defendants as to Essential.

281. By reason of its injury, proximately and directly caused by the Defendants illegal predicate activity, Liberty Mutual is entitled to Treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Essential, Abramov, Manning and the Referring Providers
### (Violation of RICO, 18 U.S.C. §1962(d))
### (Essential Enterprise)

282. Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company incorporate, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 280 above.

283. Defendants, Gregory Abramov, David Manning, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor

Zilberman, M.D. knew of, agreed to and acted in furtherance of the common and overall objective (*i.e.*, to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

284.   Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least Twenty-Seven Thousand Dollars ($27,000.00) pursuant to the fraudulent bills submitted by the Defendants through Essential.

285.   By reason of its injury, directly and proximately caused by the fraudulent scheme, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against Ideal, Naishuler, Bruk and the Referring Providers**
**(Violation of RICO, 18 U.S.C. §1962(c))**
**(Ideal Enterprise)**

286.   Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company incorporate, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 284 above.

**ENTERPRISE**

287.   Essential is a legal entity and thus is an "enterprise," as that term is defined in 18 U.S.C. §1961(4).   This legal entity enterprise engages in activities which affect interstate commerce as the pharmacy bills patients who reside in different states, and the pharmacy, in the

conducting of its business, purchases goods and services manufactured in different states which are transported to the Pharmacy by means of interstate commerce

## DEFENDANTS

288.    Defendants, Leon Naishuler, Olga Bruk, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D., are "persons" capable of holding a legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).  Defendants Leon Naishuler, Olga Bruk and the Referring Providers are distinct of Essential which is a separately incorporated entity.  Defendants, Leon Naishuler, Olga Bruk, and the Referring Providers are or were employed by and/or associated with the "Ideal" Enterprise.

## RACKETEERING VIOLATION

289.    Defendants, Leon Naishuler, Olga Bruk, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. knowingly conducted and/or participated, directly or indirectly, in the conduct of Ideal's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mail to submit or cause to be submitted thousands of fraudulent bills over the course of more than five years, all in violation of 18 U.S.C. § 1962(c).  *See* a representative sampling of the claims submitted by Ideal to Liberty Mutual through the Unites states Postal Service (USPS) which are annexed hereto as **Exhibit "4".**

290.    Ideal was not eligible to receive payments because: (i) the services billed for were not provided and/or were not provided as billed; (ii) the services billed for were not medically necessary and were performed solely to maximize billing; (iii) the billed-for-services were

- 64 -

performed pursuant to a pre-determined, fraudulent treatment and billing protocol; and (iv) the services were rendered to patients who were obtained as a result of illegal kickbacks and/or fraudulent prescriptions.

## PATTERN OF RACKETEERING ACTIVITY

291.    Ideal submits fraudulent charges to insurers.  The racketeering activity of mail fraud is separate from the activities of Ideal, which is to provide services, through prescriptions, to patients. Plaintiffs allege that the course of conduct engaged in by the RICO defendants constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(5).  Plaintiffs can show the relatedness prong because the predicate acts of mail fraud have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise," which was to submit fraudulent charges to insurers.  All predicate acts have the same purpose of defrauding the Plaintiffs through mailings from Ideal to Plaintiffs which further the fraudulent scheme involving billing for services not provided, billing for medically unnecessary services; and billing for services rendered to patients obtained through the payment of kickbacks.

292.    Plaintiffs allege that the continuity of the pattern of racketeering activity is closed-ended inasmuch as the scheme, from its inception, extends for a period of at least two (2) years. Moreover, the scheme may be found to be "open-ended" continuity because the predicate scheme of mail fraud is the regular way in which Defendants, Leon Naishuler, Olga Bruk, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. operated Ideal insofar as Ideal was never eligible to bill for or collect No-Fault benefits, and acts of mail fraud, therefore, are/were essential in order for Ideal to function.  Furthermore, the intricate planning required to carry out and conceal the

predicate acts of mail fraud implies a threat of continued criminal activity, as does the ongoing submission of claims for reimbursements and continued attempt to collect on any claims.

293. Ideal continues to submit and/or attempt collection of the fraudulent billing to the detriment of Liberty Mutual.

## CONDUCTING AFFAIRS OF THE ENTERPRISE

294. The Defendants participated in the "operation or management" of Ideal's affairs in order to affect the fraudulent scheme. In this regard, Leon Naishuler, Olga Bruk, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. were able to create and implement a pre-determined protocol for the rendition of medical services, without regard to the nature and extent of the injuries of the alleged party. This pre-determined protocol included excessive and unnecessary patient examinations. The actions were taken by the Defendants solely to generate the largest possible amount of billing to be submitted to No-Fault insurers, including Liberty Mutual.

## INJURY TO BUSINESS AND PROPERTY

295. Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at in excess of Sixty-Three Thousand Dollars ($63,000.00) pursuant to the fraudulent bills submitted by the Defendants as to Ideal.

296. By reason of its injury, proximately and directly caused by the Defendants illegal predicate activity, Liberty Mutual is entitled to Treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## ELEVENTH CAUSE OF ACTION
### Against Ideal, Naishuler, Bruk and the Referring Providers
### (Violation of RICO, 18 U.S.C. §1962(d))
### (Ideal Enterprise)

297.    Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company incorporate, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 295 above.

298.    Defendants, Leon Naishuler, Olga Bruk, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud Liberty Mutual and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to Liberty Mutual.

299.    Liberty Mutual has been injured in its business and property by reason of the above-described conduct in that it has paid at least Sixty-Three Thousand Dollars ($63,000.00) pursuant to the fraudulent bills submitted by the Defendants through Ideal.

300.    By reason of its injury, directly and proximately caused by the fraudulent scheme, Liberty Mutual is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper

### JURY DEMAND

301.    Pursuant to Federal Rule of Civil Procedure 38(b), Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First

Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company, demands a trial by jury.

**WHEREFORE,** Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company and any and all of their subsidiaries, affiliates and/or parent companies demand that a Judgment be entered in their favor:

(a) On the First Cause of Action against the Defendants, a declaration pursuant to 28 U.S.C. §§2201 and 2202, that the Pharmacy Defendants have no right to receive payment for any pending bills submitted to Liberty Mutual because the Fraudulent supplies and pharmaceuticals purportedly performed were rendered pursuant to a predetermined fraudulent treatment protocol and the billing submitted misrepresented and exaggerated the level of services purportedly performed;

(b) On the Second Cause of Action against the Defendant, AVK, a declaration pursuant to 28 U.S.C. §§2201 and 2202, that AVK has no right to receive payment for any pending bills submitted to Liberty Mutual because AVK breached a material condition precedent to coverage under the applicable policies of insurance and No-Fault regulation by refusing and failing to appear for an EUO and that Liberty Mutual is under no obligation to pay, honor or reimburse AVK for any bill submitted and for which an EUO was requested;

(c) On the Third Cause of Action against the Defendant, Ideal, a declaration pursuant to 28 U.S.C. §§2201 and 2202, that Ideal has no right to receive payment for any pending bills submitted to Liberty Mutual because Ideal breached a material condition precedent to coverage under the applicable policies of insurance and No-Fault regulation by refusing and failing to provide information and documentation sought by Liberty Mutual in a verification request and that Liberty Mutual is under

no obligation to pay, honor or reimburse Ideal for any bill submitted and for which verification was requested and not provided;

(d)     On the Fourth Cause of Action against the Defendants, compensatory damages in favor Liberty Mutual an amount to be determined at trial but in excess of One Hundred Seventy Thousand Dollars ($170,000.00) together with, costs, interest and such other and further relief as this Court deems just and proper;

(e)     On the Fifth Cause of Action against the Defendants, compensatory damages in favor Liberty Mutual an amount to be determined at trial but in excess of One Hundred Seventy Thousand Dollars ($170,000.00) for unjust enrichment plus costs and interest and such other relief as this Court deems just and proper;

(f)     On the Sixth Cause of Action against the Defendants, AVK RX Inc.,  Irina Aronova, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. a judgment in favor of Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company in an amount more than Eighty-Five Thousand Dollars ($85,000.00), together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

(g)     On the Seventh Cause of Action against the Defendants, AVK RX Inc.,  Irina Aronova, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. a judgment in favor of Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company in an amount more than Eighty-Five Thousand Dollars ($85,000.00), together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d) plus interest;

(h)     On the Eighth Cause of Action against the Defendants, Essential RX, Inc.,  Gregory Abramov, David Manning, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. a judgment in favor of Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM

Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company in an amount more than Twenty-Seven Thousand Dollars ($27,000.00), together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

(i)     On the Ninth Cause of Action against the Defendants, Essential RX, Inc.,  Gregory Abramov, David Manning, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. a judgment in favor of Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company in an amount more than Twenty-Seven Thousand Dollars ($27,000.00), together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d) plus interest;

(j)     On the Tenth Cause of Action against the Defendants, Ideal Care Pharmacy, Inc., Leon Naishuler, Olga Bruk, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D. a judgment in favor of Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company in an amount more than Sixty-Three Thousand Dollars ($63,000.00), together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

(k)     On the Eleventh Cause of Action against the Defendants, Ideal Care Pharmacy, Inc., Leon Naishuler, Olga Bruk, Alexander Baldonado, M.D., Hong Sik Pak, M.D., Paula Brown, M.D., Phyllis Gelb, M.D., Augustus Igbokwe, P.A., and Igor Zilberman, M.D a judgment in favor of Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company, Liberty Insurance Corporation, The First Liberty Insurance Corporation, LM Insurance Corporation, Liberty Mutual Mid-Atlantic Insurance Company, Liberty County Mutual Insurance Company, LM Property and Casualty Insurance Company, LM General Insurance Company, Wausau Underwriters Insurance Company, Safeco Insurance Company of Indiana, American States Insurance Company and Montgomery Mutual Insurance Company in an amount more than Sixty-Three Thousand Dollars ($63,000.00), together with

treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(d) plus interest; and

(l) For such other and further relief that this Court deems just, proper and equitable.

Dated: Wantagh, New York
       December 2, 2022

                                    Yours, etc.,
                                    **CALLINAN & SMITH LLP**

                                    By: /s/ Michael A. Callinan, Esq.
                                          Michael A. Callinan (MC7052)
                                          Vanessa H. Hlinka (VH0808)
                                          Jennifer B. Strong (JS1420)
                                          Matthew J. Smith (MS4408)
                                    3361 Park Avenue, Suite 104
                                    Wantagh, New York 11793
                                    (516) 784-5148
                                    (516) 667-1003 – *facsimile*
                                    mcallinan@callinansmith.com
                                    vhlinka@callinansmith.com
                                    jstrong@callinansmith.com
                                    mjsmith@callinansmith.com